**FIREMAN'S FUND INSURANCE COMPANY**

v.

**CHARLES CARTER CONSTRUCTION COMPANY, INC.**

**Civ. A. No. 70–208.**

United States District Court,
M. D. Louisiana.

Sept. 27, 1974.

Robert W. Smith, Seale, Smith & Phelps, Baton Rouge, for Fireman's Fund Ins. Co.

David W. Robinson, Watson, Blanche, Wilson & Posner, Walton J. Barnes, Barnes & Barnes, Baton Rouge, for Charles Carter & Co., Inc.

Charles W. Franklin, Franklin, Moore & Walsh, Baton Rouge, for National Surety Corp.

Emmett E. Batson, Baton Rouge, for Hughes-Walsh Co.

Robert S. Leake, Asst. U. S. Atty., M. D. La., Baton Rouge, for the United States.

John S. White, Jr., Kennon, White & Odom, Baton Rouge, for Maryland Cas. Co.

E. GORDON WEST, District Judge:

This suit grows out of a construction contract entered into between the defendant, Charles Carter Construction Company, Inc. (Carter) and Capitol Construction & Improvement Commission, whereby Carter undertook to construct a health and physical education building at Southeastern Louisiana College in Hammond, Louisiana. Carter, the prime contractor, subcontracted certain plumbing, heating, ventilating, and electrical work to Hughes-Walsh Company (Hughes-Walsh) who, during the construction, defaulted. National Surety Corporation (substituted with leave of Court for Fireman's Fund Insurance Company as plaintiff herein) was the surety on the subcontract and had to

finance the completion of the work under taken by Hughes-Walsh at a cost of approximately $212,000. At the completion of the job, Carter was withholding from payments due Hughes-Walsh the sum of $54,259.42, which National Surety, by this suit, seeks to recover. Carter refused to pay these moneys over because it claims (1) that Hughes-Walsh is indebted to Carter for $33,529.04 as a result of Hughes-Walsh's failure to perform its work in a workmanlike manner and/or as a result of damage to Carter's property due to negligence on the part of Hughes-Walsh, and (2) that all funds that might be due Hughes-Walsh are encumbered by a federal tax lien up to the amount of $77,387.82. The counterclaim or offset in the amount of $33,529.04 allegedly due by Hughes-Walsh to Carter is made up of the following items: (1) $418.18 for installation of a louver door for access to a water heater made necessary, according to Carter, by the improper placement of the water heater by Hughes-Walsh; (2) $281.87 for installation of "collars" around certain flues which Carter contends were called for on the plans and not installed by Hughes-Walsh; (3) $1,454.18 for miscellaneous electrical work paid for by Carter but which, according to Carter, should have been performed by Hughes-Walsh; (4) $1,561.94 for light fixtures and other miscellaneous items and labor which Carter contends should have been furished by Hughes-Walsh; (5) $8,684.57 for finishing the installation of and balancing the air conditioning and heating equipment; (6) $21,128.30 for cost of replacing a portion of the gymnasium floor which was damaged by water allegedly due to either poor workmanship or negligence on the part of Hughes-Walsh.

Carter, anticipating that the plaintiff might contend that the damage to the floor was caused by vandalism, filed a third party complaint against Fireman's Fund Insurance Company, its builder's risk insurance carrier, for judgment over on this item should it be determined that vandalism was the cause of the damage. Hughes-Walsh, in order to protect its surety, intervened, asking that all of the funds withheld by Carter be credited against the surety bond posted by National Surety. Hughes-Walsh then also filed a third party complaint against its liability insurer, Maryland Casualty Company, seeking judgment over against it should it be determined that the damage to the floor was caused by the negligence of Hughes-Walsh rather than by unworkmanlike performance of its contract. Maryland Casualty Company defends on the grounds that if the damage to the floor was caused by breach of contract, its liability policy did not cover such a loss, and if the damage to the floor was caused by negligence on the part of Hughes-Walsh, while its liability policy did cover that type of liability, nevertheless, Carter's claim for damages based on negligence had prescribed by the passage of one year between the time of the occurrence and the time of filing suit.

The damage to the floor was discovered on July 16, 1969, and this suit was not filed until October 8, 1970, with Carter's allegations of negligence coming at an even later date.

This case was tried without a jury on May 6, 1974, and at the conclusion of the trial, for oral reasons assigned, a transcript of which has been placed of record, the Court concluded that the first five items hereinabove listed, totaling $12,400.74, were indeed items which Carter had to pay for because of a breach of contract by Hughes-Walsh, and are items for which National Surety, as the surety for Hughes-Walsh, must be held responsible. The Court reserved its ruling at that time on the question of who would ultimately be liable for the $21,128.30 item representing replacement of a portion of the gymnasium floor which had been damaged by water leaking from a section of the plumbing installed by Hughes-Walsh, but it did resolve the question of whether or not the damage was caused by vandalism, and whether or not Carter's claim on

this item was one in contract or in tort. The Court concluded, for the reasons orally stated, that there was no evidence of any kind to justify a holding that the damage was caused by vandalism, and the Court thereupon granted the motion of Fireman's Fund Insurance Company for an involuntary dismissal, dismissing that party from the suit. The Court further concluded that the water damage to the floor was not caused by a breach of contract, but by negligence on the part of Hughes-Walsh, or on the part of someone for whom Hughes-Walsh was legally responsible. Maryland Casualty Company does not deny that their liability policy was issued to protect Hughes-Walsh against its negligence, but it contends that Carter's tort claim against Hughes-Walsh prescribed by the passage of one year following the water damage to the floor and that therefore neither Hughes-Walsh nor Maryland can now be held for those damages. This being the only question remaining, the Court requested and received excellent and scholarly briefs from all counsel, and now, after due consideration thereof, the Court concluded that even though more than one year had elapsed between the time of the damage to the floor and the assertion by Carter of its defense of offset, such a defense is not barred by the one year prescriptive period provided for by Louisiana law.

█ █ While Maryland contends that Article 424 of the Louisiana Code of Civil Procedure (LSA–C.C.P. Art. 424) is "clearly a procedural rule" and "not applicable" to a diversity case in the federal court, this is merely a conclusion of counsel with no supporting authority being cited.

LSA–C.C.P. Art. 424 provides:

"A person who has a right to enforce an obligation also has a right to use his cause of action as a defense. A prescribed obligation may be used as a defense if it is incidental to, or connected with, the obligation sought to be enforced by the plaintiff."

There is no dispute about the fact that any original claim that Carter might have had against Hughes-Walsh based upon negligence in connection with the flooding of the gymnasium floor had been lost by the one year prescriptive period which applied to tort actions in Louisiana. The sole question here is whether or not this claim was still available to Carter as a *defense* under the provisions of Article 424 above quoted. As to whether or not Article 424 is purely procedural, as contended by Maryland, this Court is of the opinion that it is no more procedural than is the prescriptive period itself that is provided for in the Civil Code. The mere fact that it is included in the Code of Civil Procedure does not automatically make it non-substantive. The purpose of Article 424 is to preserve, in a limited fashion, a substantive right, and to provide for its enforcement under the conditions enumerated in Article 424. This partial preservation of a substantive right is just as cognizable in the federal court in a diversity action as is the prescriptive provision contained in the Civil Code that would, under other circumstances, extinguish that right. But Maryland then says that even if Article 424 is available to a defendant in a diversity action, it has no application here because the "tort claim" which Carter seeks to enforce is not "an obligation" as contemplated by Article 424. In support of this point Maryland relies primarily on Articles 2207 and 2209 of the Louisiana Civil Code, (LSA–R.C.C. Art. 2207, 2209), which provide:

"Article 2207. When two persons are indebted to each other, there takes place between them a compensation that extinguishes both the debts, in the manner and cases hereafter expressed."

and

"Article 2209. Compensation takes place only between two debts, having equally further object a sum of money, or a certain quantity of consumable things of one and the same kind, and

which are equally liquidated and demandable."

While it is questionable whether or not these Articles, dealing with "Conventional Obligations," should be controlling in cases involving Article 424 of the Louisiana Code of Civil Procedure, which speaks in terms of both "obligation" and "cause of action," the fact remains that even an application of these Articles to the present situation would permit Carter to urge his prescribed tort claim as a defense. These two Articles of the Civil Code deal primarily with the liquidity of the two demands. Maryland cites City of Shreveport v. Curcio, 157 So. 317 (La.App. 2nd Cir. 1934) as authority for its position. In that case, the City sued to collect a paving assessment, and the defendant reconvened for damages to pay her property. She alternatively pleaded the same damages as an offset. The Court held, incidentally, that the "reconventional demand" had prescribed, but held primarily that the defendant could not plead in compensation the totally unliquidated tort claim as an offset against a totally liquidated claim whether the tort claim had prescribed or not. But as to liquidity, the Court said:

"The words 'equally liquidated' in this article (2209) are self defining, and mean that if one of the debts is not determined, *or susceptible of easy and brief determination,* such debt cannot be successfully pleaded as set-off or compensation against one liquidated, certain and determined. If it requires a lawsuit to determine the exact amount due under a cause of action, certainly it follows that the amount involved in such a cause of action is not liquidated, but, on the contrary, is clearly in unliquidated form. And such was the claim of defendant for the damages to her property resulting from the raise in the grade of Ashton street adjacent thereto." (Emphasis added.)

The Court then went on to say:

"In the lower court, and here, defendant invoked the doctrine brought down to us from the Romans: "Quae temporalia sunt ad agendum perpetua, sunt ad excipiendum.' This doctrine was applied to defendant's case by the judge of the court a quo. In effect it means that defendant could not use her cause of action as a means of attack or sword, but could use it as a shield or defense to the amount of the city's claim. This would unquestionably be true, even though defendant's claim for damages had prescribed, if such claim were 'equally liquidated' with that of plaintiff. Oil Belt Motor Co. v. George T. Bishop, Inc., 167 La. 183, 118 So. 881. This, we hold, is not the case."

The circumstances of the present case are sufficiently different from those in *City of Shreveport* to make the Court's reasoning there supportive of Carter's position rather than opposed to it. The first question that must be asked is whether or not Carter's claimed offset is really unliquidated. The floor of the gymnasium suffered water damage in the amount of $21,128.30. That exact amount was expended by Carter to repair or replace the floor. No one has ever contested that figure, even at the trial of this case. Carter has bills and paid receipts to verify this expenditure, and not one word has been uttered to contradict that fact. It took no lawsuit to establish the amount of damage to the floor. The only need for the law suit was to decide who would ultimately be liable for the purely liquidated amount of damage to the floor. The *City of Shreveport* case recognized the fact that " * * * even though defendant's claim for damages had prescribed, if such claim were 'equally liquidated' with that of plaintiff" it could be used as a defense to the plaintiff's claim. As a matter of fact, this offset claim of Carter was probably more liquidated than was the plaintiff's claim because it took considerable testimony to establish the amounts of the various other claims involved while it took none to establish the exact amount of the damage to the gymnasium floor. Since all of the other

cases cited by Maryland deal also with purely unliquidated offset claims, they are not applicable to the present situation.

Indeed, as pointed out by both Maryland and Carter, the Louisiana Fourth Circuit Court of Appeal, in a 1972 case, permitted a prescribed, unliquidated tort claim to be used as a defense against a liquidated claim. This was the case of Young v. Fremin-Smith, Inc., 265 So. 2d 341 (La.App. 4th Cir. 1972) and in the opinion of this Court, more properly states the law of Louisiana than does the *City of Shreveport*. In *Young*, the principal demand was for unpaid wages. The defendant employer reconvened for damages to his equipment allegedly caused by the employee's negligence and for loss of reasonably expected rentals from the damaged equipment. Plaintiff pleaded the prescriptive period of one year to this tort action which the Court held well founded. But the Court then treated the reconventional demand as a defense and held that even though it had prescribed as a *demand*, it could, under the provisions of LSA–C.C.P. Art. 424 be urged as a *defense*. The Court then found that since the damage to defendant's equipment far exceeded the wages due the plaintiff, "the obligation is extinguished by judicial compensation as recognized and defined by the Supreme Court in the case of Tolbird v. Cooper, 243 La. 306, 143 So.2d 80 (1962)." Even though this Court has concluded that Carter's offset claim was a liquidated claim, reference to the *Tolbird* case makes it abundantly clear that in order to urge a prescribed claim as a defense pursuant to LSA–C.C.P. Art. 424, the requirements of LSA–R.C.C. Art. 2209 need not be present.

█ In *Tolbird*, the Louisiana Supreme Court recognized three kinds of compensation, i. e., legal compensation, which takes place by mere operation of law, contractual compensation, which is effected by the will of the parties, and judicial compensation, which is decreed by the Court. The Court, in stating that Civil Code Article 2209 deals only with legal compensation, said:

"The conditions for this legal compensation are set out in our Article 2209:

" 'Compensation takes place only between two debts having equally for their object a sum of money, or a certain quantity of consumable things of one and the same kind, and which are equally liquidated and demandable. ⁂ ⁂ ⁂.'

"Saunders' Lectures on the Civil Code of Louisiana (1925), p. 446, says:

" 'In that case [A owes B and B owes A] the law steps in and silently cancels these opposing debts; assent and concurrence of the parties are not necessary; their knowledge of what the law is doing is not required. But this extinguishment takes place only when the debts are equally due, equally liquidated and equally demandable. ⁂ ⁂ ⁂ ' "

The Court goes on to say:

"Judicial compensation, on the other hand, takes place when a court decides that two parties before it are mutually indebted to each other, and balances the amounts found to be owed in fixing the judgment. ⁂ ⁂ ⁂

"Planiol says of this judicial compensation:

" 'There is judicial compensation when a debtor who is sued for the execution of a debt files a reconventional demand against the plaintiff pleading a credit in opposition to the original demand, which credit does not have or fulfill the conditions required for legal compensation. It may be, for example, that the credit claimed in the reconventional demand is not liquidated; or it may be the result of damages caused by the plaintiff to the defendant —damages that must be evaluated in order to fix the amount of the indemnity due. But the judge, having jurisdiction of the demand, can make such evaluation, and by the same judgment fix the amount of the damages· and effect the compensation."

Thus it apparent that Article 424 of the Code of Civil Procedure does no violence to Article 2209 of Civil Code, and when it speaks in terms of "obligations" and "causes of action" it directs itself to both legal compensation and judicial compensation as the case may be. It permits the urging of prescribed "obligations" and "causes of action" as defenses whether the conditions of Article 2209 of the Civil Code are met or not. This is precisely what was done in Young v. Fremin-Smith, Inc., supra.

It is next argued by Maryland that even if the prescribed tort claim can be urged as a defense, Article 424 requires that the claim urged must be "incidental to, or connected with, the obligation sought to be enforced by the plaintiff." This argument needs little comment except to say that the two obligations here involved certainly fulfill that requirement. Both the claim of the plaintiff, National Surety Corporation, and the debt asserted as a defense by Carter, resulted directly from the contract between Carter and Hughes-Walsh to construct the building in question. It is difficult to conceive how these claims could be much more closely connected. They both grew directly out of the same joint effort to construct a building.

For these reasons, and for the oral reasons stated at the conclusion of the trial, the Court now concludes (1) that in view of the conflicting claims of Charles Carter & Company, Inc., Hughes-Walsh Company, Inc., and the United States of America, Charles Carter & Company, Inc. has the right to withhold the funds in its possession pending a determination of the validity of those claims; (2) that Hughes-Walsh Co., Inc. is indebted to Charles Carter & Company, Inc. for all of the claims hereinabove enumerated totaling the sum of $33,529.-04, and that that amount must be offset against any funds in the hands of Charles Carter & Company, Inc. that may be due and owing to Hughes-Walsh Company Inc., or its assignee. Any moneys due to Hughes-Walsh from Carter, after, deducting the sum of $33,529.04, and remaining in the hands of or under the control of Carter must be relinquished to the United States of America to apply against the $77,387.82 tax lien with which those funds are encumbered. Judgment will be entered herein accordingly, and counsel for Charles Carter & Company, Inc. is instructed to present to the Court a proposed judgment in accordance herewith.